## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 1:00-CR-157-RCL-14** |
| **CALVIN SMITH,** | |
| *Defendant*. | |

## <u>MEMORANDUM OPINION</u>

Even good lawyers make mistakes.  Sometimes, their mistakes are so serious that they prejudice the outcome of their client's case.  This opinion arises out of an ineffective assistance of counsel evidentiary hearing held for Calvin Smith, one of several defendants charged and convicted in an extraordinarily lengthy trial that ended over 20 years ago.  By mandate issued by the D.C. Circuit, this Court was directed to evaluate whether Mr. Smith's defense counsel failed to adequately represent him for one of the three murders he was convicted of participating in.

During opening arguments for the trial, Mr. Smith's defense counsel promised the jury that an eyewitness would identify other people, and not Calvin Smith, as being present and involved in the relevant murder.  No other theory or defense was raised as to that murder.  Over half a year into the trial, on the day the witness was set to be called, and after the defense case-in-chief had already begun, Mr. Smith's counsel discovered that the witness was not just unhelpful, but potentially extraordinarily damaging to the defense.  So, he declined to call the witness.  Consequently, the defense strategy collapsed.

After consideration of defense counsel's briefing, ECF No. 2910, the government's briefing, ECF No. 2909, the whole record, and the applicable law, the Court concludes that counsel rendered objectively ineffective performance that prejudiced Mr. Smith.  The Court does not reach

this decision lightly.  Counsel was, and is, a good lawyer.  Counsel practiced before this Court for several years.  The Court personally observed counsel diligently advocate for his clients in case after case.  Yet here, counsel made a mistake of constitutional significance.  Therefore, the Court will **VACATE** Mr. Smith's convictions on Counts Four and Five.

## I.    BACKGROUND

### A.  The Underlying Trial

"[D]uring the late 1980s and 1990s, . . . Calvin Smith . . . , along with others, . . . conspired to conduct and did conduct an ongoing drug distribution business in Washington, D.C." *United States v. Moore*, 651 F.3d 30, 39 (D.C. Cir. 2011) (per curiam), *aff'd sub nom. Smith v. United States*, 568 U.S. 106 (2013).  The undersigned presided over a trial in which the government presented evidence of 31 murders, as well as other crimes, related to the drug conspiracy against Mr. Smith and five co-defendants.  After many months of testimony, the jury convicted all six defendants, with Calvin Smith being found guilty of seven counts.[1]  ECF No. 2183.

The overwhelming majority of the charges and evidence are irrelevant for the present motion.  Instead, the Court will focus on two particular counts of conviction—murder in the first degree, in violation of 22 D.C. Code §§ 2401, 3202, and 105, and aiding and abetting continuing criminal enterprise murder, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2, both related to the murder of Anthony Dent—which the U.S. Court of Appeals for the D.C. Circuit remanded back to this Court.

At trial, "[t]he government alleged that Smith assisted" two of his co-defendants, "[Rodney] Moore and [Kevin] Gray in murdering Dent because Dent was delinquent in a debt to

---

[1] These included drug distribution and RICO conspiracy (Count One and Count Two), the murder of Anthony Dent (Count Four and Count Five), the murder of Henry Lloyd, Jr. (Count Fifteen), and the murder of Eric Moore (Count Nineteen and Count Twenty).

Moore." *Moore*, 651 F.3d at 84.  That is, the government argued that Mr. Smith aided and abetted the murder by working to locate Dent and then acting as a lookout for Gray and Moore.  *Id.*  To link Mr. Smith to the murder, the government relied on two witnesses, Raymond Sanders and Maurice "Mo" Andrews.  *Id.* at 66, 84, 88; *see also* Evidentiary Hr'g Tr. ("Hr'g Tr.") 69–70.[2] Both testified that they observed Mr. Smith, Gray, and Moore searching Dent's block before the murder occurred.  *Moore*, 651 F.3d at 84.  Sanders testified that Moore asked him where to find Dent while Mr. Smith was with him.  *Id.*  He also testified that Gray and Mr. Smith were wearing dark clothes.  *Id.*  Andrews saw a person in dark clothes shoot Dent and saw the same three people—Mr. Smith, Gray, and Moore—near the murder scene shortly after the murder.  *Id.* Furthermore, he testified that years later, Gray explained that Moore had paid money for Dent's murder and "that while Smith, Gray, and Moore searched for Dent, Smith argued with Gray over who would actually shoot Dent and receive the $5,000. Gray apparently won the argument, and, after locating Dent with Smith and Moore's help, killed Dent."  *Id.*

The defense's theory was that another drug dealer, not Mr. Smith or his associates, was responsible for Dent's murder.  One of Mr. Smith's two defense attorneys, John Carney, previewed the defense during his opening statement.  He told the jury, "you will find that there is an eyewitness that identified other people and not Calvin Smith as being present and involved."  *Id.* at 85 (quoting Trial Tr. (May 13, 2002 AM) at 92).  Mr. Carney was referring to an eyewitness by the name of Leo Benbow.  Hr'g Tr. 137.  Defense counsel's theory was that a man by the name of Clayton Lorenzo Thomas had shot Dent.  *See id.*  Mr. Smith's defense counsel appeared to expect that Benbow would testify that Clayton Thomas had shot Dent, along with two other people, and that Calvin Smith had not.  *See id.* at 107, 111; Gov.'s Ex. 3.  At trial, however, Benbow was never

---

[2] The hearing transcripts are available at ECF Nos. 2894–96.

called as a witness.  And, by the time Mr. Smith's defense rested, the jury had never been presented with evidence of Mr. Benbow's existence.

Between the defense's opening, and the end of Mr. Smith's case, there had been several developments.  All of them give context to the ultimate decision not to call Benbow as a witness.

During the government's case-in-chief, Mr. Carney's co-counsel, Jonathan Rubens, withdrew from representation due to health problems.  Hr'g Tr. 6.  Originally, it would have been Rubens's job to present the defense case-in-chief.  *Id.*  Without Rubens, Mr. Carney was left with the unexpected job of presenting the defense case.  *Id.*; *see also* Trial Tr. (Nov. 14, 2002) at 88 ("Your Honor, as you know, a lot of my witnesses, my co-counsel had done.").  In particular, Rubens was "the one that would have prepared Benbow" for trial.  Hr'g Tr. 137.

One week after the government rested its case-in-chief, Mr. Carney began calling witnesses related to the Dent murder.  He presented testimony by two former D.C. police officers who had investigated the shooting of a man named Michael Taylor.  Trial Tr. (Nov. 14, 2002) at 83–86.  After establishing that Taylor's shooting happened on the same block and the same night as Dent's murder, Mr. Carney elicited that "Clayton Lorenzo-Thomas" was arrested for the Taylor shooting.  *Id.*  When counsel tried to also offer into evidence that Taylor had positively identified Clayton Thomas as his shooter, the Court sustained an objection and excluded the evidence.  *Id.* at 89.  Instead, during direct examination, Mr. Carney established that there had been a positive photographic identification (without naming who was identified) and that the shooting was over a drug debt.  *Id.* at 93.  The other defense witness on this topic, Lester Rhone, testified that the bullets fired from a gun used in the Taylor shooting were "tantalizingly close to being a perfect match" to the bullets recovered from the Dent murder and therefore it was likely the bullets were fired from the same gun.  *Id.* at 33–34.  Mr. Carney had thus linked the shooting of Taylor to the murder of

Dent, and introduced evidence that Clayton Thomas was at one time suspected of being involved in the former.

Mr. Carney planned to call Benbow as the next witness for the defense following the officers' testimony. Hr'g Tr. 91, 135–36. However, that day, both the government and counsel for Smith's co-defendant Moore suggested that calling Benbow as a witness would present problems under *Bruton v. United States*, 391 U.S. 123, 127–28 (1968), which forbids certain kinds of out-of-court admissions from a non-testifying defendant being used against a co-defendant. Trial Tr. (Nov. 14, 2002) at 99. Following the officers' direct testimony, Mr. Carney had the following exchange with Moore's counsel:

> Moore's Counsel: I do just want to note a concern that even that sanitized testimony, when viewed together within the testimony of what I'm told to anticipate from—the next witness may provide— could present a very serious continuing *Brut*[ ]*on* type problem for us.
>
> The Court: What is next?
>
> Mr. Carney: Your Honor, I'll be frank with the Court. It is not my intention to call Benbow to go into the Dent shooting.
>
> If I did, I think we would have a mistrial.

*Id.*[3] That was the first indication, on the record, that Mr. Carney would not be calling his key eyewitness. *Id.* And this was not Mr. Carney's intent at the beginning of the day. Hr'g Tr. 91, 135–36. Consequently, sometime between the beginning of the day and that moment, Mr. Carney had decided to forgo Benbow's testimony. And he did so over his client's objection. *Id.* at 91–92.

---

[3] It appears that Mr. Carney and Moore's counsel were concerned that Benbow would have testified that Moore was one of the individuals involved in the Dent murder and therefore link Mr. Smith to that crime. *Moore*, 651 F.3d at 87. Ultimately, the D.C. Circuit established Benbow's testimony could not have presented a *Bruton* problem and counsel's arguments to the contrary were clearly incorrect at the time. *Id.*

Mr. Carney was then asked why, if Benbow was no longer a witness, the earlier testimony from the officers was relevant. After all, Benbow was meant to identify Clayton Thomas as Dent's shooter and thereby affirmatively link the two shootings. In response, Mr. Carney explained:

> The predicate goes from the fact there was a person that had the gun with—that matches the defendant shooting. I'll try to remove that gun from my client that Mo Andrews, over objections, testified yes, Calvin Smith gave the gun to Rodney—or to Kevin Gray.
>
> This goes to putting that gun, just a few hours earlier, as someone else identified as Clayton Thomas. I will tell the Court that the government is free to call Benbow. They know where he is. He's out there in the witness program. If they choose. They want to open up this can of worms, they're free to do that.
>
> But I won't be introducing it, based on the limited ability of myself and my limited ability to go into this through these two officers. Severely hamstrung. First of all, I'm missing photographs that I can't go into with Benbow because they're not in the jacket. They're missing the photographs from [Dent] and Michael Taylor.

Trial Tr. (Nov. 14, 2002) at 100. After this exchange, the government elicited on cross-examination that Taylor had identified Clayton Thomas as one of three men who had shot him and that the men had all shot him at the same time. *Id.* at 101. This testimony, combined with the testimony by Mr. Smith's witnesses on direct examination, established that three men shot Taylor, that Clayton Thomas was identified as one of the three men, and that one gun used at the shooting was likely also used for the murder of Dent. No witness testified that Mr. Smith was not at the Dent murder, nor whether he was one of the three men who shot Taylor.

During his closing statement, Mr. Carney spoke about the weakness of the government's case, in terms of both the evidence collected and the steps of the investigation. First, he argued that the government's witnesses were "bought, bad, and unbelievable." Trial Tr. (Dec. 2, 2002 AM) at 52. Second, he argued "sloppy police work" and lack of proper investigation meant that the government did not generate enough evidence to prove the charges beyond a reasonable doubt.

*Id.* Then, he moved to his affirmative argument. He reasoned that the gun used in the Taylor shooting on the same block on the same night was also used to murder Dent, that Clayton Thomas was linked to the Taylor shooting, and asked how the gun could have gotten from the Taylor shooting to Calvin Smith only a few hours later. Trial Tr. (Dec. 2, 2002 PM) at 35. In making this argument, Mr. Carney highlighted that he never presented an affirmative eyewitness, stating: "[s]o Thomas is linked to the Dent shooting. How is he linked to the Dent shooting? Well, it's not so much that you have someone saying he's there. It's the same type of analysis the government does. And we're talking just here about the gun." *Id.*

On rebuttal, the government responded to Mr. Carney's defense case simply and apparently effectively. "You could just as easily conclude whoever was responsible for the murder of Anthony Dent—and we've proven it was Kevin Gray and Calvin Smith and Rodney Moore—you could just as easily conclude that they were involved in the shooting of Michael Taylor." Trial Tr. (Dec. 4, 2002 PM) at 68. After an objection by Mr. Carney that there was "no evidence" of that argument, the government went even further stating:

> There is no evidence of it. He's right. There is no evidence of it. Nor is there any evidence that Clayton Thomas had anything to do with this murder. It goes both ways. You can't throw out this possible gun match and say that's reasonable doubt.
>
> The judge will instruct you. You're allowed to draw reasonable inferences based on the evidence and the testimony. You're allowed to draw reasonable inferences. You're not allowed to speculate. You're not allowed to speculate. There has been no evidence about the shooting of Michael Taylor at all. You don't know why it was done. You don't know who did it. You don't know anything about it.
>
> . . .
>
> You can't speculate there was a connection. We can't ask you to speculate there was a connection between our defendants and the

7

> shooting of Michael Taylor. Nor can he ask you to speculate the
> other way around. Remember that.

*Id.* at 69.  The jury subsequently convicted Mr. Smith for aiding and abetting Dent's murder.

### B. The D.C. Circuit's Opinion

After trial, Mr. Smith, along with his co-defendants, appealed to the D.C. Circuit on a variety of theories and issues.  *Moore*, 651 F.3d at 39.  For the Dent murder, Mr. Smith challenged both the sufficiency of the evidence presented against him as well as the election by his counsel not to call Benbow.  The D.C. Circuit issued an opinion in 2011 denying the overwhelming majority of the defendants' objections.  As to Mr. Smith's role in the Dent murder, the Circuit "ha[d] little trouble concluding that the evidence sufficed for a rational jury to find Smith's guilt beyond a reasonable doubt."  *Id.* at 83.  Nevertheless, it found that Mr. Smith made a colorable claim of ineffective assistance of counsel related to the lack of testimony from Benbow.  *Id.* at 89.

The Circuit began by noting the importance of Mr. Carney's opening statement to the jury that "you will find that there is an eyewitness that identified other people and not Calvin Smith as being present and involved."  *Id.* at 85 (quoting Trial Tr. (May 13, 2002 AM) at 92).  In the Circuit's estimation:

> As groundwork for this defense, Smith introduced expert testimony
> that bullets fired from a gun used in the attempted murder of Michael
> Taylor were "tantalizingly close to being a perfect match" to those
> collected following Dent's murder a day later. The expert opined
> that it was "likely" the bullets were fired from the same pistol.
> Building on this connection between the Taylor and Dent shootings,
> which occurred at the same location, Smith intended to establish,
> through identifications made by Taylor and Benbow, that Thomas
> and two others, neither of them Smith, were involved in both crimes.

*Id.* (internal citations omitted).

After reviewing the discussions about *Bruton*, and the evidence actually admitted, the Circuit concluded that Mr. Smith made out a colorable claim "that his counsel's decision not to

call Benbow to testify was constitutionally deficient, and that he was prejudiced by his counsel's conduct." *Id.* at 87.  The Circuit was unsure why Mr. Carney believed calling Benbow "would precipitate a mistrial" or "how the district court's evidentiary rulings or other circumstances" affected his decision.  *See id.*  As the Circuit noted, and this Court explained earlier, *Bruton* could not apply to Benbow's testimony.  *See id.*  "The current record, [was] inconclusive as to whether the allegations 'reflect the trial counsel's informed tactical choice.'"  *Id.* (quoting *United States v. Reeves*, 586 F.3d 20, 26 (D.C. Cir. 2009)).

The Circuit could not determine from the record whether Mr. Smith suffered any prejudice. *Id.* at 88.  However, it noted that "[i]t is conceivable that Smith could have pursued his defense based solely on Taylor's identification of Thomas in the first shooting and the similarity in the bullet markings between the shootings, but there was no other evidence in the record linking Thomas directly to Dent's murder" and that "[w]ithout Benbow's eyewitness account of the Dent murder and identification of Thomas, the jury was left to infer from Smith's evidence that Thomas shot Dent and to weigh this inference against the testimony of government witnesses that Gray, with Smith's assistance, committed the murder and later claimed credit for it."  *Id.* at 88–89. Although, the panel noted there was some question whether Benbow would have testified that Moore was one of the individuals involved in the Dent murder and therefore actually link Mr. Smith to that crime.  *Id.* at 87.

In closing, the Circuit summarized as follows:

> The government's theory at trial was that Gray murdered Dent while Smith served as a lookout. Smith's defense was that Thomas and his cohort murdered Dent. No evidence linked the two groups; there was only the government's conjecture that one of Thomas's accomplices, identified as "Rodney," was in fact Rodney Moore. There is a "colorable" argument that Benbow's testimony would not have precipitated a mistrial or hampered Smith's defense, yet would

have significantly altered the balance of evidence, tipping the scales
in Smith's favor.

*Id.* at 89.  Given the muddled record regarding why counsel did not offer Benbow's testimony, and

the associated evidentiary questions, the D.C. Circuit remanded the case to this Court for further

examination of whether Mr. Smith's trial counsel was ineffective in his defense on the Dent

murder—particularly related to whether he made an informed tactical choice related to Benbow's

testimony.  *See id.* at 87, 89.

### C.  The Time Between the Remand and the Evidentiary Hearing

Mr. Smith appealed the D.C. Circuit's decision to the Supreme Court, which granted his

petition for certiorari.  ECF No. 2556.  While the case was pending, the United States filed a status

report suggesting a timeline for further proceedings and stating, in a footnote, that Mr. Smith's

case was pending before the Supreme Court and therefore excluded his ineffective assistance of

counsel issue from the proposed timeline.  ECF No. 2540 at 3.

The judgment of the Supreme Court (on an unrelated question) was issued in February of

2013, and this Court was informed by letter from the D.C. Circuit in April of that year. ECF

No. 2556.  In March, a new defense attorney, Richard Stern, was appointed to represent Mr. Smith.

ECF No. 2554.  In January of 2014, Mr. Stern moved to vacate, set aside, or otherwise correct Mr.

Smith's sentence under 28 U.S.C. § 2255.  ECF No. 2583.  Stern recognized that Mr. Smith's

conviction was not final, but that he was filing the motion to vacate "out of an abundance of

caution" and asked for leave to supplement later.  *Id.* at 2.  He then told the Court that "Defendant

seeks an evidentiary hearing to address all of the issues he raises after the completion of review of

the record."  *Id.* at 3.

Stern never informed the Court that he completed his review of the record, nor did he ever

supplement his filing.  In November of 2016, this Court stated that it expected to set a schedule

10

for supplementation of the various defendants' § 2255 petitions and suggested that the various defense counsel confer and submit a joint scheduling order.  ECF No. 2608.  Later that same month, Stern moved to withdraw because "defendant Calvin Smith has written to the Court asking that new counsel be appointed and has filed a complaint against [Stern]."  ECF No. 2615.  When the defendants submitted a joint status report for further proceedings, they noted that Mr. Smith's counsel did not participate because of the motion to withdraw.  ECF No. 2617.  They then requested that the schedule be filed "30 days from the entry of new counsel for Mr. Smith, or resolution of the Motion to Withdraw."  *Id.*

The Court granted Stern's motion to withdraw in January of 2017.  The Court then ordered that, 30 days from entry of new counsel for Mr. Smith, the defendants were to submit a proposed scheduling order.  ECF No. 2623.  New counsel, John Briley, entered an appearance two days later, and then all defendants moved to extend the time for a proposed scheduling order until one of Smith's co-defendants, Gray, obtained new counsel.  ECF No. 2627.  In May of 2017, Briley asked that the Court to unseal certain parts of the docket and highlighted that the information would be relevant to the evidentiary hearing to be held on the ineffective assistance of counsel claim.  *See* ECF No. 2632.  When Briley later reviewed the trial transcript, he discovered that he had previously represented a witness in the case and therefore had a possible conflict of interest in continuing to represent Mr. Smith.  ECF No. 2640.  He therefore moved to withdraw in August of 2018.  He filed a second motion to withdraw in January of 2020, which this Court granted.  ECF Nos. 2651, 2655.  New counsel, Erik Barron, appeared in March of 2020.  ECF No. 2653.

In September of 2020, the Court ordered Mr. Smith's counsel and the government to propose a schedule for the evidentiary hearing.  ECF No. 2667.  As of October of 2020, Barron was "unable to secure the trial record in this case and prior counsels' files" due to the COVID-19

pandemic and therefore requested a hearing date of March 1, 2021.  ECF Nos. 2692, 2697.  In December of 2020, the Court set a briefing schedule, with an evidentiary hearing to start in June of 2021.  ECF No. 2736.  Barron later moved to continue the hearing because he was unable to establish contact with Mr. Smith, nor locate Benbow, and he wished for additional time to review material relevant to the hearing.  ECF No. 2789.

In November of 2021, Barron withdrew, and Elizabeth Van Pelt appeared for Mr. Smith.  ECF No. 2828.  Ms. Van Pelt moved for a hearing in March of 2022, and this Court then set the evidentiary hearing to begin in August of 2022.  ECF No. 2844.  On motion from the defendant, this Court then continued the hearing to November of 2022, ECF No. 2851, and after a status hearing, reset the evidentiary hearing to February 8–10, 2023, at which time it was held.

### D.  The Evidentiary Hearing

At the hearing, the Court heard from six witnesses: Jonathan Rubens; Leo Benbow; Philip Becnel, investigator for the defense; Mr. Carney; Rocco Cianciotti, a former D.C. police officer; and Calvin Smith, Sr., Mr. Smith's father.  By far, the most substantial testimony was from Mr. Carney, who detailed the reasons behind why he decided not to call Benbow on the day he was supposed to testify.  The Court will begin by reviewing the witnesses other than Mr. Carney.

First, Rubens testified as to his role as co-counsel for Mr. Smith's defense before he had to withdraw due to his medical issues.  Hr'g Tr. 6.  As this Court previously noted, he had originally planned to present the defense case, and call Benbow, but had to withdraw and leave those tasks to Mr. Carney.  *Id.*  Rubens testified extensively about why Benbow would have been an unfavorable witness primarily because he was incarcerated in Atlanta, Georgia at the time of the trial, alongside other issues.  *See id.* at 8–21.  But, as Ms. Van Pelt identified, the evidence shows that Rubens was, in fact, mistaken and thinking of a different potential witness.  *See id.*  Therefore,

12

the Court must disregard his testimony regarding the issues with Benbow that Rubens identified. He also identified a purported direct examination outline of Benbow as being his, Smith Ex. 1, but he did not remember preparing such an outline. Finally, he explained that there was no formal breakdown for how the investigation operated, but that the defense investigator, Becnel, worked for Mr. Carney. Hr'g Tr. 13.

Second, Benbow testified, although he was unable to provide any relevant information beyond what was already in the record. In 2003, he injured his head at work and had surgery, and in 2017, he further injured his head in a car accident. *Id.* at 34–35. At present, he sometimes forgets his own name, but he remembers being incarcerated in the 1980s. *Id.* at 34–35, 37. He also testified that he would not have remembered anything related to the case if asked as long ago as 2010. *Id.* at 43.

Third, Becnel testified that he interviewed Benbow in September 2002, took a witness statement, and wrote a report, Smith Ex. 3. Hr'g Tr. 49. He had no independent recollection of the conversation, nor any other statements Benbow might have given to the police. *Id.* He did not recall having any concerns about Benbow's credibility. *Id.* He stated that he would have written in his report if Benbow had identified a co-defendant as being involved in the Dent murder. *Id.* at 49–50. He had no recollection of either Rubens or Mr. Carney meeting with Benbow, or any conversations with them about the witness. *Id.* Later, he testified that he is "fairly positive" Mr. Carney was not at the interview with Benbow and that Rubens was not at the meeting. *Id.* at 264. He also remembered interviewing a Larry Lucas in Atlanta, who was almost certainly the witness Rubens was thinking of during his testimony. *Id.* at 58. Becnel testified that Benbow would have been shown a photograph of Mr. Smith that was unrepresentative of how he looked when the Dent murder was committed. *Id.* at 56. Finally, he explained that he would not have generally shared

13

his impressions about whether to call a witness unless he had a "really strong opinion[] about it." *Id.*

The fifth witness to testify was former police officer Cianciotti. He was involved in the investigation of Dent's murder and took a witness statement from Benbow in the 1990s. He identified several exhibits but had little independent recollection of the events. *Id.* at 230–43.

Sixth, Calvin Smith, Sr. testified that he did not know Benbow and had never interacted with him. *Id.* at 327.

While those witnesses all added some pieces to the story of Mr. Smith's prosecution and conviction for Dent's murder, the main witness was naturally Mr. Carney. Mr. Smith's former counsel showed up to the evidentiary hearing well-prepared. He spoke candidly, gave detailed responses to virtually every question from Mr. Smith's current counsel, and, importantly, did not attempt to hedge or hide things from the Court. Mr. Carney took meticulous notes while representing Mr. Smith and consulted those notes during the hearing. He ably demonstrated that although twenty years have elapsed, he retains a good memory of his decisions during the trial and their precipitating events. At bottom, Mr. Carney testified thoroughly and knowledgeably, laying out his thought process and detailing the extensive reasons why he did not call Benbow. At times, he was emotional. But the Court ultimately believes his testimony. The Court emphatically rejects any contention by Mr. Smith's current counsel that Mr. Carney's reasons were invented post-hoc, or that they are otherwise not credible.

Critically, Mr. Carney confirmed that he was not under a mistaken impression of law as to *Bruton*. *Id.* at 213–14. Instead, he listed thirteen reasons why he chose not to call Benbow including Benbow's: (1) lack of credibility; (2) inconsistent statements; (3) drug use; (4) possible corroboration of other drug evidence; (5) inconsistency regarding the murder weapon identified

14

and the weapon actually used; (6) incorrect statement as to the number of shooters; (7) inconsistency with the evidence as to the distance between the shooter and victim; (8) inconsistency with other witnesses; (9) inability to see the alleyway and therefore failure to rebut the lookout theory; (10) inability to maintain a story on cross-examination; (11) potential identification of co-defendant Moore as one of the shooters, as revealed during the interview on the day of his testimony; (12) statement that the shooter was a "juvenile" and Mr. Carney's fear that he may identify Mr. Smith as the possible shooter, as revealed during the interview on the day of his testimony; and (13) the possibility that Benbow might otherwise be called as a witness by a defendant or the government. *Id.* at 104–27, 195–300.

The most crucial issue, then, is what made Mr. Carney change his mind between when he arrived at the courthouse and when he decided not to call Benbow. He stated that he was already having second thoughts about calling Benbow as a witness, but that he made the decision not to call Benbow "in court" right before, or right after, he called the two D.C. police officers. *Id.* at 91, 135–36. The change came after he interviewed Benbow twice, once in the morning and once in the afternoon. *Id.* at 111, 135. These meetings were supposed to be about "preparing [Benbow] to testify." *Id.* at 112. But, from those interviews, Mr. Carney had come to the conclusion that Benbow was actually a "bad witness" who would "mak[e] the government's case." *Id.* at 123, 126. Mr. Carney stated that he believed that Benbow would identify one of the three individuals at the murder of Dent as being Moore (therefore linking an associate of Mr. Smith's to the crime), and that he might, on cross-examination, say that Mr. Smith was the third individual at the murder. *Id.* at 118, 126, 205–09. And so, when Mr. Carney stated to the Court that he was worried about a mistrial, he was referring to the possibility of Benbow identifying Moore and Mr. Smith as being the second and third of the three people who killed Dent—therefore leading the judge to declare a

mistrial on Counts Four and Five because the defendant put on evidence to make the government's case. *Id.* at 126. At the same time, he admitted that was already worried that he had not been performing well with his defense on the Dent murder. *Id.* at 121. So, instead, after leaving behind his Benbow strategy, he argued at closing "insufficiency of evidence" and "failure to investigate." *Id.* at 126.

## II.   LEGAL STANDARDS

To prevail on a claim of ineffective assistance of counsel, a defendant "must prove both incompetence and prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Specifically, he must demonstrate that (1) "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984).

That sets a high bar, as a court's evaluation of counsel's actions "must be highly deferential," and is assessed under the circumstances present at the time of representation without the benefit of hindsight. *Id.* at 689. Furthermore, a "reasonable probability" under *Strickland*'s second prong is one that is "sufficient to undermine confidence in the outcome." *Id.* at 694. To establish prejudice, the petitioner must show there is "a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotations and modifications omitted). An ineffective assistance of counsel claim is defeated if the defendant fails to demonstrate either prong. *Strickland*, 466 U.S. at 700.

## III.   DISCUSSION

For the reasons set forth below, the Court concludes that Mr. Smith's trial counsel rendered ineffective assistance as to Counts Four and Five. The Court therefore need not address Mr.

Smith's motions to dismiss Counts Four and Five for violation of the Sixth Amendment's Speedy Trial Clause and the Due Process Clause of the Fifth Amendment.

## A. Mr. Smith has Demonstrated Deficient Performance

To prevail on deficient performance, Mr. Smith must show that Mr. Carney failed to make an "informed tactical choice" related to his decision not to call Benbow.  *Moore*, 651 F.3d at 87 (citation omitted).  That is, counsel usually must make "drastic missteps," *United States v. Soto*, 132 F.3d 56, 59 (D.C. Cir. 1997), that fall below an "objective standard of reasonableness," *United States v. Abney*, 812 F.3d 1079, 1086 (D.C. Cir. 2016).  "It will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the identified acts or omissions overcome the presumption that a counsel rendered reasonable professional assistance. . . . [C]onsideration is [to be] given to counsel's overall performance, before and at trial."  *Morrison*, 477 U.S. at 386 (internal quotation marks omitted). Mr. Carney is a good lawyer and for years ably represented criminal defendants before this Court. But after much consideration, the Court concludes that Mr. Smith has met his burden under the unique circumstances here.

To be clear, Mr. Carney did *not* render constitutionally deficient performance simply by failing to call Benbow as a witness.  That was Mr. Smith's main argument, and the Court finds it unpersuasive given Mr. Carney's detailed and highly credible explanation of why Benbow's testimony could have caused real damage to the defense.  The decision not to call a witness due to possible issues with the testimony is exactly the kind of "tactical choice" protected by the *Strickland* standard.  *United States v. Toms*, 396 F.3d 427, 435 (D.C. Cir. 2005) (characterizing the choice of which witnesses to call on behalf of the defendant "a tactical decision of the sort engaged in by defense attorneys in almost every trial" (internal quotation marks omitted) (quoting

*United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999))).  Instead, his error was the failure to make an "*informed* tactical choice" regarding the defense strategy for the Dent murder—a strategy based around calling Benbow up until the day he was not offered to the jury.  *See Moore*, 651 F.3d at 87 (emphasis added) (citation omitted).

The deficiency is most clearly shown at the time of the opening statement in the case.  By then, the defense team was sufficiently convinced that Benbow was a strong enough witness to make his anticipated testimony the centerpiece of the defense on Counts Four and Five.  Indeed, the only specific argument in the opening for the Dent murder was Benbow's testimony.  Mr. Carney stated, in whole: "The third murder, Anthony Dent, you will find that there is an eyewitness that identified other people and not Calvin Smith as being present and involved."  *See* Trial Tr. (May 13, 2002 AM) at 92; Hr'g Tr. 137.  No other argument or defense was mentioned for Counts Four and Five.

Defense counsel's deficient performance is the product of two related principles: failure to investigate before making strategic decisions and failure to deliver on a promise to the jury.

First, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690.  That is the critical piece of the *Strickland* standard.  Without such a rule, judges could sit long after trial with a cold record and critique those decisions made in the moment based on plausible and understandable bases.  Nevertheless, the necessary counterweight to the thoroughly-investigated-decision rule is that uninformed and poorly investigated decisions do not receive such a presumption of propriety. "[C]hoices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Id.* at 691.  "It is especially important that counsel adequately investigate the case, because only when reasonable

investigation has been performed is counsel in a position to make informed tactical decisions." *United States v. Mohammed*, 863 F.3d 885, 890 (D.C. Cir. 2017) (internal quotation marks and alteration omitted) (quoting *United States v. Barbour*, 813 F.2d 1232, 1234 (D.C. Cir. 1987)).  In other words, when counsel fails to inform himself such that he can make a proper strategic tactical choice, he risks that decision being found ineffective.

The second principle relates to promises made to a jury.  Simply put, when a "counsel's opening prime[s] the jury to hear a different version of the incident [and] counsel fail[s] to produce the witnesses to support this version, the jury [is] likely [to] conclude[ ] that counsel could not live up [to] the claims made in the opening." *Harris v. Reed*, 894 F.2d 871, 879 (7th Cir. 1990).  "A number of circuits have held, in similar circumstances, that a lawyer's unfulfilled promise of key testimony qualifies as deficient performance under *Strickland*." *Williams v. Woodford*, 859 F. Supp. 2d 1154, 1167, 1170–71 (E.D. Cal. 2012) (citing *Anderson v. Butler*, 858 F.2d 16 (1st Cir. 1988); *United States v. Gonzalez–Maldonado*, 115 F.3d 9, 15 (1st Cir. 1997); *Harris*, 894 F.2d at 879; *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 259 (7th Cir. 2003); and *McAleese v. Mazurkiewicz*, 1 F.3d 159, 166 (3d Cir. 1993)); *see also Saesee v. McDonald*, 725 F.3d 1045, 1049–50 (9th Cir. 2013) (recognizing, after *Williams*, that "in some cases—particularly cases where the promised witness was key to the defense theory of the case and where the witness's absence goes unexplained—a counsel's broken promise to produce the witness may result in prejudice to the defendant.").  And, although it ultimately rejected the defendant's ineffective assistance claim, the D.C. Circuit has acknowledged that a lawyer's unfulfilled promise can constitute ineffective assistance if the defendant shows actual prejudice.  *United States v. Udo*, 795 F.3d 24, 30–31 (D.C. Cir. 2015).

Put differently, "[t]he failure of counsel to produce evidence which he promised the jury during his opening statement that he would produce is indeed a damaging failure sufficient *of itself* to support a claim of ineffectiveness of counsel." *McAleese*, 1 F.3d at 166 (emphasis added). So, when defense counsel promises the jury some alternative version of events, and a witness to support that version, he had better be ready to follow through. In that way, an otherwise strategically valid decision might be rendered invalid because of a promise made in opening. *See Anderson*, 858 F.2d 16, 18 (1st Cir. 1988) (finding counsel's decision not to call a witness would have normally been a protected strategic decision, but was ineffective because defense counsel promised the testimony in opening), *aff'd sub nom. Com. v. Anderson*, 408 Mass. 803, 563 N.E.2d 1353 (1990).

Taking those principles together, defense counsel's decision to base the Dent murder defense around Benbow—premised on an uninformed understanding of Benbow's credibility and substantive testimony—and promise that theory in opening, constituted inadequate performance. Mr. Smith's defense counsel broke a crucial promise to the jury, and upended the defense's strategy, because counsel made that choice before determining what the key witness was ready to say. That renders the defense strategy, and the promise of testimony, an unreasonably *uninformed* choice not to be protected under *Strickland*.

First, for vetting Benbow, the evidence shows that Mr. Smith's defense counsel poorly investigated the witness's faults prior to promising his testimony, prior to the beginning of the defense case-in-chief, and even prior to the day of his testimony.

In September of 2001, Mr. Carney sent a memorandum to his investigator, Becnel, about the investigative plan for the Dent murder. Gov.'s Ex. 3. He laid out several options, including two possible eyewitnesses: Dawn Carter and Leo Benbow. *Id.* Citing police reports and notes

from around the time of the murder, Smith Ex. 4, he stated that Benbow saw three men, including men by the name of Rodney Freeman and Clayton Thomas, shoot Dent along with "a light skinned dude."  Gov.'s Ex. 3.  Mr. Carney asked his investigator to track down leads regarding both witnesses and potential corroboration for their stories.  *Id.*  He directed Becnel to "Find Leo Benbow."  *Id.*  He noted at the end that "[w]hen these people are located, I have specific questions to ask. So try and catch me before you talk to them. I may wish to take a statement from Benbow."  *Id.*  At the time, he also said that Benbow "is a witness at trial for our defense."  *Id.*

Approximately eight months later, in May of 2002, Mr. Carney delivered his opening statement and promised the eyewitness who would exonerate Mr. Smith.  Two months after that, Benbow was served with a subpoena to appear and testify.  Smith Ex. 5.  And approximately two months after that—four months after opening argument and a year after defense identified Benbow as a possible, critical eyewitness—Becnel interviewed Benbow (apparently for the first time) about what he saw that night.  Hr'g Tr. 55, 179.  During that interview, he identified Clayton Thomas as being one of the three individuals to kill Dent, stated that Calvin Smith was not, and signed a statement to that effect.  Smith Ex. 3; Hr'g Tr. 55, 179.  Mr. Carney testified that he believes he was present when Benbow was interviewed by Becnel but can't be certain.  Hr'g Tr. 95, 179 (Mr. Carney referring to an interview around September 11, 2002, or a day or so earlier).  Becnel is "fairly positive" that Mr. Carney was not there.  *Id.* at 269.  Whether or not Mr. Carney was there in September of 2002, there is no evidence that anyone from the defense team had substantively interviewed Benbow prior to that point, and certainly not before the May 2002 opening statement.  Based on the record before the Court, it appears that the promise in the opening statement was based on almost no actual knowledge of Benbow's credibility and likely substantive testimony— outside of the available police reports and discussions with other potential witnesses at the scene

21

who "completely contradicted everything Benbow was saying," *see id.* at 182.[4]   Even if there had

been some substantive contact not otherwise memorialized or explained, the investigation was

objectively deficient given that it inexplicably failed to uncover the crucial reasons why Benbow's

testimony posed a ticking time bomb for the defense before opening statements.  *See supra* Part

I.D.

That lack of adequate investigation must then be paired with the broken promise and the

collapse of the defense strategy at trial.  *See Williams*, 859 F. Supp. 2d at 1171 (holding that

"promising the testimony of one witness [] to whom no one from the defense team had talked, and

as to whom there were serious doubts he could be put on the stand at all" was sufficient to establish

deficient performance).  Mr. Carney promised Benbow's testimony in May of 2002.  From then,

up until the day of Benbow's expected testimony, Mr. Smith's defense on the Dent murder

centered on Benbow.  As Mr. Carney stated in opening, an independent eyewitness would establish

that other people committed the murder and that Mr. Smith was not present.  And indeed, the only

affirmative Dent-related-evidence introduced during the defense case-in-chief—that Clayton

Thomas was identified and arrested in connection with the earlier shooting, that the charges were

later dropped, and that one gun at the first shooting was likely used at the second shooting—was

almost wholly dependent on the line that Benbow would draw between the two shootings.  Without

his testimony that Clayton Thomas and two individuals who were not Mr. Smith were responsible

---

[4] Although Mr. Carney indicated that he had some initial interview with Benbow before September of 2002, *see* Hr'g
Tr. 108, 137, 309, review of the whole record suggests that he confused whether he interviewed Benbow at that time
with his review of police reports containing information he says he learned from an interview.  *See* Gov.'s Ex. 3
(discussing the known information about Benbow's account and calling him "a witness at trial for our defense");
Smith's Ex. 4 (police reports from the time of the murder).  That conclusion is also suggested by Becnel's testimony
about finding a witness and then interviewing him at the same time.  Hr'g Tr. 268.  Furthermore, Mr. Carney's
testimony suggests an initial interview would not have substantively probed Benbow's credibility or expected
testimony.  *See id.* at 137–38.  Ordinarily, Mr. Carney waited until "right when [he was] going to call [a witness]" to
prepare them for trial by refreshing their memory and reviewing their expected testimony for problematic statements.
*Id.* at 138.  Rubens was set to prepare Benbow prior to his withdrawal from the case.  *Id.*

for the Dent shooting, this connection was never established.  And because the link was not made, the jury could have actually believed that Mr. Smith was not only responsible for the Dent murder, for which he was charged, but that he might have also been involved in the Taylor shooting that same night.  All of which was only brought to the jury's attention through the *defense's* evidence and witnesses.

The decision to snap the line that Benbow would have drawn was made while Mr. Carney was in court, after he had begun to put on his defense, mere minutes before Benbow was set to testify, based on his last-moments witness preparation session with Benbow.  *See* Hr'g Tr. 91, 112–15, 135–36.  Without Benbow, Mr. Smith was left, in the middle of his case-in-chief, with just "a common defense when you really don't have enough" which is a "failure to investigate" claim along with arguing there "was a gap" in the evidence, particularly regarding how the same gun was used in both shootings.  *Id.* at 119, 122, 126.  In the end, the government used the evidence that *was* admitted by Mr. Smith's counsel to suggest Mr. Smith either was involved in the first shooting that night, or alternatively, that Mr. Smith's only defense was so speculative as to be unbelievable.  Trial Tr. (Dec. 4, 2002 PM) at 68–69.

To be clear, the Court is not laying out a general rule that counsel per se performs deficiently when he changes strategy after an opening statement or promises the jury something but fails to deliver.  The crux of the issue here is that Mr. Smith's defense counsel failed to determine whether his key witness as to two murder counts was ready to establish the defense's theory of the case before making that testimony the sole theory promised to the jury.  There was a plethora of reasons why Mr. Carney believed Benbow was unfit to testify in favor of the defense case.  *See supra* Part I.D.  The Court credits those reasons.  Several of those flaws were so substantial that Mr. Carney believed they could have resulted in a mistrial.  The Court credits that

belief.  But while counsel is free to change trial strategy to fit evolving needs, he is not free to develop, out of unjustified ignorance, an entire defense strategy around a "bad witness," Hr'g Tr. 123, so flawed that Mr. Carney believed calling him could have meant "convicting [his] client," *id.* at 153; *see Leibach*, 347 F.3d at 257 (7th Cir. 2003) (holding that unexpected developments may justify reneging on a promise, but when the failure to deliver "cannot be chalked up to unforeseeable events, the attorney's broken promise may be unreasonable").

The Court acknowledges that Rubens was originally responsible for preparing Benbow to testify. Hr'g Tr. 137.  His withdrawal left Mr. Carney holding the bag.  But the fact that Mr. Carney relied on Rubens does not excuse his failure to earlier discover Benbow's flaws.  Mr. Carney did not direct co-counsel to investigate Benbow before the May 2002 opening statement and co-counsel did not meaningfully investigate Benbow before withdrawing.  *See id.* at 8–21, 49–50, 264.  Mr. Carney bears ultimately responsibility for promising an exculpatory eyewitness to the jury without first investigating their credibility and expected testimony.  Although the Court is sympathetic to the fact that Mr. Carney and co-counsel shared responsibility for preparing Benbow, diffusion of responsibility cannot excuse the defense team's failure to timely investigate. Further, even though Mr. Carney had ample reason to abandon Benbow after discovering his flaws, defense counsel's predicament was avoidable.  The Court respects Mr. Carney and reiterates that he is a good lawyer.  Nevertheless, he committed the kind of drastic misstep that constitutes deficient performance under *Strickland*.

In sum, Mr. Carney dramatically altered his defense strategy because he did not know his own key witness.  He made this switch following his promise that eyewitness testimony would exonerate his client; after the government finished presenting its evidence; and after the beginning of Mr. Smith's case-in-chief.  Indeed, he made the decision mere minutes before Benbow was set

to take the stand, as he sat in the witness room waiting to be called.  Under these circumstances, the Court cannot countenance the actions of Mr. Carney as being an informed tactical decision worthy of protection under *Strickland*.

### B.  Mr. Smith has Established Prejudice

Beyond establishing deficient performance, Mr. Smith is also required to show that he suffered prejudice due to his counsel's performance.  *Udo*, 795 F.3d at 31 (explaining that constitutional ineffectiveness is not presumed when a lawyer fails to deliver on a promise that a witness will testify).  To do so, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687–88, 694.  That reasonable probability should be one "sufficient to undermine confidence" in Mr. Smith's convictions on Counts Four and Five.  *Id.* at 694.  When assessing prejudice, the question is whether the defendant has shown a reasonable probability that, absent deficient performance, "trial counsel [could] sow sufficient doubt . . . to sway even one juror."  *Mohammed*, 863 F.3d at 892 (internal quotation marks and citation omitted).

To start, the Court must consider the state of the evidence against Mr. Smith.  The *Strickland* Court itself recognized that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." 466 U.S. at 696.  In *Udo*, the D.C. Circuit found no prejudice from counsel's unfulfilled promise that the defendant would testify because the jury was presented with overwhelming video and documentary evidence of the defendant's guilt.  795 F.3d at 31.  In other words, there was no prejudice because the "case was not a close call."  *Id.*  Here, in contrast, the D.C. Circuit has already acknowledged the weakness in the government's case against Mr. Smith as to Counts Four and Five.  Not only did the government lack physical evidence, the entire prosecution was based

25

on the testimony of two witnesses who saw Mr. Smith, Gray, and Moore in the area of the murder before and afterward, heard Moore with Smith asking about Dent's whereabouts, observed Gray and Mr. Smith wearing dark clothes, saw a person in dark clothes shoot Dent, and heard from Gray, years after the murder, that Moore commissioned the murder with Mr. Smith expressing a willingness to shoot Dent. *See Moore*, 651 F.3d at 84. These witnesses were certainly not without faults. Both were drug dealers who had been part of the murderous Moore/Gray drug enterprise and who had turned government's evidence. *Id.* at 66, 84, 88; *see also* Hr'g Tr. 69–70. That is to be expected in many cases involving violent drug trafficking gangs. The people best suited to discuss the activities are often involved themselves and testifying to help their own sorry cases. Yet, as a matter of fact, those two disreputable eyewitnesses do not make for an overwhelming government case. The Circuit accordingly determined that the evidence against Mr. Smith was strong enough to meet sufficiency of the evidence, *Moore*, 651 F.3d at 84, but weak enough to allow for a colorable prejudice claim, *id.* at 89. Under *Strickland*, the state of the government's case must be balanced against defense counsel's deficiency to determine the probable effect of counsel's errors. And balanced against the deficient performance identified here, there is a reasonable probability of a different outcome absent the deficient performance.

By breaking his promise to the jury, Mr. Carney implied that there never was an eyewitness who "identified other people and not Calvin Smith as being present and involved," Trial Tr. (May 13, 2002 AM) at 92, or alternatively created the negative inference that the eyewitness testimony would have actually incriminated Mr. Smith. *See Harris*, 894 F.2d at 879. "[W]hen counsel primes the jury to hear a different version of the events from what he ultimately presents, one may infer that reasonable jurors would think the witnesses to which counsel referred in his opening statement were unwilling or unable to deliver the testimony he promised." *McAleese*, 1

F.3d at 166–67.  Indeed, one circuit has held that such broken promises alone may be "prejudicial as matter of law."  *Anderson*, 858 F.2d at 19.  This Court declines to go that far because an unfulfilled promise will not necessarily prejudice a defendant.  *Udo*, 795 F.3d at 31.  Juries are presumed to obey court instructions that statements and arguments by counsel are not evidence. *See United States v. Williams-Davis*, 90 F.3d 490, 507 (D.C. Cir. 1996).  For that reason, a statement or argument made during opening or closing ordinarily will not be prejudicial unless it was particularly egregious and general curative instructions were inadequate to cure its harmful effects.  *Id.*  Hence, a properly-instructed jury may simply ignore promises by counsel and may not actually "feel betrayed when the promise goes unfulfilled . . . [or] draw negative inferences from the unexplained absence [to] fill any gaps that might otherwise exist in the prosecution's case."  *Contra Williams*, 859 F. Supp. 2d at 1167, 1170.   A lengthy break between opening statements and the beginning of jury deliberations further reduces the likelihood that a statement improperly influenced the jury.  *Williams-Davis*, 90 F.3d at 508.  Most courts to address this basis for ineffective assistance have elided these concerns.  Nevertheless, the D.C. Circuit has seriously considered that a defendant may suffer prejudice if counsel's broken promise directly affected how the jury evaluated the substantive evidence.  *See Udo*, 795 F.3d at 31 (analyzing how the broken promise affected the jury's evaluation of videotape evidence and other witnesses).  Thus, "where the promised witness was key to the defense theory of the case and where the witness's absence goes unexplained—a counsel's broken promise" makes a start at prejudice but is not sufficient unless it directly affected the jury's evaluation of the substantive evidence.  *See Saesee*, 725 F.3d at 1049–50.  Here, Mr. Smith's counsel told the jury that an exculpatory eyewitness would establish that other persons committed the charged crime and that the defendant was not present—

with no other suggested defense and no later explanation for the failure to produce that witness. This sufficed to make a start at prejudice.

Defense counsel's broken promise became prejudicial once he affirmatively introduced evidence of the shooting of Michael Taylor.  In order to lay the groundwork for Benbow's expected testimony, Mr. Carney called two former D.C. police officers to establish that a second shooting involving three people happened on the same block a couple of hours before the murder of Dent. Defense counsel's evidence showed that Clayton Thomas was identified and arrested in connection with the shooting but that the charges were later dropped.   Defense counsel also demonstrated that it was likely the gun used in the first shooting was also used in the second shooting.  Defense counsel then decided not to call Benbow.  "Without Benbow's eyewitness account of the Dent murder and identification of Thomas, the jury was left to infer from Smith's evidence that Thomas shot Dent and to weigh this inference against the testimony of government witnesses that Gray, with Smith's assistance, committed the murder and later claimed credit for it."  *Moore*, 651 F.3d at 89.  In rebuttal, the government used this same evidence to suggest to the jury that they could infer that Mr. Smith was actually involved in two shootings that night, rather than one.  Trial Tr. (Dec. 4, 2002 PM) at 68–69.  Alternatively, the prosecutor asked the jury to conclude that Mr. Smith's only defense was so speculative as to be unbelievable.  *Id.*

These facts are sufficient to establish that counsel's unfulfilled promise directly affected how the jury evaluated the substantive evidence and to overcome the presumption that promises delivered by counsel during opening are harmless because a properly instructed jury will ignore them.  In a close case, while laying the groundwork for a witness he promised but ultimately never delivered, counsel introduced otherwise unrelated evidence from which the jury could infer Mr. Smith's involvement in another shooting.  In so doing, Mr. Carney reminded the jury of his

unfulfilled promise to deliver an exculpatory eyewitness.  *See* Trial Tr. (Dec. 2, 2002 PM) at 35.

The prosecutor took advantage of this evidence by arguing to the jury that it could infer from the

evidence that Mr. Smith was involved in both shootings.  Trial Tr. (Dec. 4, 2002 PM) at 68.  This

left the jury to balance two disreputable government witnesses against Mr. Smith's meager and

problematic evidence: a story that the otherwise unknown Clayton Thomas and two unknown

accomplices were identified as shooting one person that night, possibly over a drug debt, and that

the gun used was likely used again for the Dent murder, with no other evidence or explanation.

Mr. Smith promised exculpation by eyewitness, but "[b]y his closing argument, it was clear that

none would be testifying and that his defense had fallen apart."  *See Williams*, 859 F. Supp. 2d

at 1174.   The contrast between Mr. Smith's thin narrative and the government's otherwise

middling evidence could not have been lost on the jury.  *See id.* at 1172 ("The unfulfilled promises

made by [defense] counsel were prejudicial not only because of the magnitude of their harm but

because of just how close a case this was.").  Under those circumstances, "[f]ailure to provide th[e]

promised testimony," combined with the testimony actually provided, "surely helped the jurors set

aside any doubt they might otherwise have had."  *See id.*  If Mr. Carney had not made that promise

and had not introduced evidence of the Taylor shooting, there is a reasonable probability the

members of the jury would not have credited the government's evidence as establishing Mr.

Smith's guilt beyond a reasonable doubt.  It is a difficult finding, and one the Court would hesitate

to reach had defense counsel not introduced otherwise unconnected evidence of the Taylor

shooting, but the Court must ultimately conclude that there is a sufficient probability that the

explosion of the defense's Dent murder case, due to the deficient performance identified, caused

the jurors to convict Mr. Smith on Counts Four and Five.

*        *        *

The Court sympathizes with Mr. Carney.  He was, and is, a good lawyer who took on a monumental task under the most challenging circumstances.  During an extraordinarily lengthy trial, he valiantly tried to defend his client against an excellent team of government attorneys.  And he did so even after his co-counsel left him with a ship he was not supposed to captain.  Nevertheless, this issue fell through the cracks.  He discovered, too late, that his purportedly golden witness was rusted over.  He was forced to break his promise to the jury and upend his defense theory; ultimately, his client was convicted.  Balancing the strength of the government's case against these drastic missteps, there is a reasonable probability that counsel's errors led to the jury's guilty verdict on this one murder.  Accordingly, the Court will vacate Mr. Smith's conviction as to those counts.

## IV.    CONCLUSION

Based on the foregoing, the Court will **VACATE** Mr. Smith's conviction on Counts Four and Five due to ineffective assistance of counsel.

A separate order will issue.

Date:    6/26/23

Royce C. Lamberth
United States District Judge